**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE WEINSTEIN COMPANY | ) | Case No.: 18-10601 (MFW) |
| HOLDINGS LLC, et al.,[1] | ) | (Jointly Administered) |
| | ) | |
| Debtors, | ) | |
| _____ | ) | |
| | ) | Adversary Case No.: |
| HOTEL MUMBAI PTY LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| THE WEINSTEIN COMPANY LLC | ) | |
| and ITS RELATED AND | ) | |
| AFFILIATED DEBTORS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| _____ | | |

**COMPLAINT**

Hotel Mumbai Partners Limited ("**HMPL**" or "**Plaintiff**"), alleges as follows:

**PARTIES**

1.      Plaintiff, HMPL, is a proprietary limited company incorporated under the laws of

the Commonwealth of Australia with offices in Fremantle, Australia.

---

[1] The last four digits of The Weinstein Company Holdings LLC's federal tax identification number are (3837). The mailing address for The Weinstein Company Holdings LLC is 99 Hudson Street, 4th Floor, New York, New York 10013. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at http://dm.epiq11.com/twc.

2.      Defendant, The Weinstein Company LLC ("**TWC**"), is a Delaware limited liability company with its principal place of business in New York, New York, and is one of the above-captioned chapter 11 debtors and debtors in possession.

3.      On March 20, 2018 (the "**Petition Date**"), TWC and fifty-four affiliated entities (collectively, the "**Debtors**"), commenced voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). 11 U.S.C. § 101 *et seq*. The Debtors continue to operate their businesses and manage their financial affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' bankruptcy cases are jointly administered under The Weinstein Company Holdings, LLC, Case No. 18-10601 (MFW), which is the direct or indirect owner of the other Debtors.

## REQUIRED PLEADING DISCLOSURE

4.      Pursuant to Delaware Local Bankruptcy Rule 7008-1, the Plaintiff consents to the entry of a final order or judgment on this adversary complaint (the "**Complaint**") and action by the Court.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.§§ 157 and 1334 because the claims for relief ("**Claims for Relief**") in this Complaint arise in or are related to the Debtors' bankruptcy cases pending under the Bankruptcy Code in this Court.  This is a core proceeding under 28 U.S.C. § 157(b).

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Debtors' bankruptcy cases are pending in this district.  Pursuant to 28 U.S.C. § 1391, venue is also appropriate in this district because TWC is a duly licensed and organized limited liability company in accordance with the law of the state of Delaware.

## STATEMENT OF FACTS

7.     HMPL is the producer of a full-length feature motion picture currently entitled "Hotel Mumbai" (the "**Picture**"). The Picture stars Armie Hammer, Dev Patel, Jason Isaacs and Nazanin Boniadi.  The Picture centers on the November 2008 terrorist attacks by Islamic radicals that took place in Mumbai, India, leaving more than 160 people dead. It is based on a screenplay dated February 2016 written by John Collee and Anthony Maras, directed by Anthony Maras and produced by HMPL.  The production of the Picture has been completed and based thereon, the final editing, marketing and distribution of the Picture by its domestic distributor should be in process in order to meet a projected release deadline of October 2018.

8.     TWC was incorporated in April 2005 by Robert and Harvey Weinstein, the brothers who founded Miramax Films in 1979.   Since its creation and up to the Petition Date, TWC was a "mini-major" film and television production studio that created, produced, and distributed feature film and premium television content for the U.S. and international markets.  TWC has produced numerous critically acclaimed and commercially successful films, receiving approximately 28 Academy Awards and 113 Academy Award nominations, including but not limited to: "Vicky Cristina Barcelona", "The Kings Speech", "The Reader", "Inglourious Basterds", "Scream 4", "Spy Kids", The Artist", "The Master", "Undefeated", "Silver Linings Playbook", and "Django Unchained."   Pre-petition, TWC also had an active television production division which garnered twelve Emmy nominations in 2015 alone, and produced, among other shows:  "Project Runway", "Under the Gunn", and "Threads."  TWC also developed "Nanny Diaries" and produced "The No. 1 Ladies' Detective Agency."   TWC had a significant working relationship with Netflix and produced several "scripted series" including John Fusco's "Marco Polo."

9.      The historical success of TWC is unquestionable, and it was well known that TWC, by and through its Co-CEO's Harvey Weinstein and Robert Weinstein, held extensive power in the film and television industry, a significant distribution network and the financial wherewithal to fully execute a meaningful and effective marketing program superior to those of direct competitors.  As a result, TWC was much sought after by independent film producers as a licensee for the distribution and marketing of their films.

10.      Based upon TWC's reputation and its success in the marketing and distribution of independently produced films, in or around 2016, HMPL approached TWC to determine whether TWC would consider entering into an agreement for the marketing and distribution of the Picture.

11.      During the course of discussions that occurred from at least April 2016 through May 12, 2016 by and between HMPL's representatives, Gary Hamilton (CEO of Arclight) Joe Cohen, among others, and TWC representatives, Harvey Weinstein, David Glasser and Talia Houminer (TWC's in house counsel), among others, TWC orally and in writing  represented that it would, among other things:

   a.      Distribute and market the Picture throughout the United States, Canada, United Kingdom, Bahamas, Bermuda and Caribbean plus customary islands, territories and possessions (collectively, the "Territory");

   b.      Spend a minimum of $10 million in the marketing of the Picture;

   c.      Prepare a marketing and distribution plan to be disseminated to HMPL in advance so HMPL could timely provide the plan to its international distributors (to ensure the coordination of the domestic and international marketing and distribution of the Picture for maximum exploitation of the Picture);

d.      Pay all "Distribution Costs and Expenses" including, without limitation, all costs and expenses in connection with delivery materials, advertising, publicity, promotion, exploitation, sale and/or distribution of the Picture (including, without limitation, the cost to create posters, trailers, TV spots, and other costs of creating marketing materials), the costs of research (including test screenings), film festivals, creation of bonus materials, editing, post production reshoots, the costs of print creation and duplication, insurance, shipping, taxes (other than corporate income taxes), checking and collection costs, MPAA, AMPTP and other trade associate fees or dues payable by TWC, conversion costs, etc.;

e.      Release the Picture in no less than 800 theaters simultaneously;

f.      Invite Dev Patel and Armie Hammer to one United States celebrity premiere of the Picture (and pay their costs and the costs of one guest); and

g.      Mutually (with HMPL) determine the final cut of the Picture released in the Territory.

12.    Based upon the representations of TWC as to its contemplated marketing and distribution plans for the Picture, including its promise to spend at least $10 million on marketing, and in justifiable reliance thereon, HMPL, as licensor, and TWC, as licensee, entered into that certain "Exclusive License Agreement" (the "**License Agreement**") dated May 12, 2016, pursuant to which TWC acquired the licensing and distribution rights for the Picture for the Territory.  A true and correct copy of the License Agreement is attached as **Exhibit 1**.

13.    HMPL entered into the License Agreement with TWC based upon, among other things, TWC's known reputation and abilities for successfully executing distribution and marketing plans for independent films, its financial prowess, its known relationships with

distributors of content such as Netflix, etc. and its ability to advocate on behalf of its films for various awards such as the Academy Awards, Golden Globes, etc.

14.    At no time during the course of the negotiations for the License Agreement or at any time thereafter did Harvey Weinstein, David Glasser, Talia Houminer or any other representative or agent of TWC disclose to HMPL or to any of its related or affiliated entities the threat of the ongoing Harvey Weinstein sexual scandal – a ticking time bomb that when made public would destroy TWC's reputation and its ability to operate its business.

15.    HMPL is informed and believes and based thereon alleges that  Harvey Weinstein's sexual exploitations were well known to TWC officers and board of directors, including David Glasser, who primarily negotiated the License Agreement on behalf of TWC.  HMPL is further informed and believes and based thereon alleges that TWC and its officers and directors, including David Glasser, participated in a cover-up of Harvey Weinstein's sordid history of sexual abuse (the "**TWC Cover-Up**"), and that TWC's officers and directors knew the "issue" was effectively a ticking time bomb that would decimate TWC when the full extent of Harvey Weinstein's illegal actions became known to the general public.

16.    Although rumors of Harvey Weinstein's sexual misconduct had circulated in Hollywood for years prior to 2016, at no time did HMPL have information as to the alleged depth and depravity of Harvey Weinstein's conduct and the impact it would have on TWC's brand, goodwill and ability to operate its business when finally revealed.  Nor did HMPL know or have information to know that TWC's officers and directors knew of Harvey Weinstein's conduct and not only condoned the same, but participated in the cover-up of numerous charges, allegations and settlements of claims arising out of and relating to his alleged crimes against, and sexual exploitation of, women.

17.     Had HMPL known, at any time, before or during the negotiations for the License Agreement of the TWC Cover-Up and the extent of Harvey Weinstein's alleged crimes and misconduct, it never would have entered into the License Agreement or allowed the Picture to be distributed by TWC or to be associated in any way with the now discredited TWC brand.

18.     In October 2017, *The New York Times* and *The New Yorker* reported that dozens of women accused Harvey Weinstein of sexual assault and abuse over a period of at least 30 years. Shortly thereafter, Harvey Weinstein was dismissed by TWC and expelled from the Academy of Motion Picture Arts and Sciences and other professional associations. As a result thereof and when the full extent of Harvey Weinstein's alleged crimes were revealed, the TWC brand became toxic, with no one in the industry willing to engage in any business transactions with TWC.  HMPL is informed and believes that criminal investigations into complaints from various women are ongoing in Los Angeles, New York City, and London.

19.     On or about February 11, 2018, the Attorney General for the State of New York filed a Verified Petition against TWC, The Weinstein Company Holdings, LLC, Harvey Weinstein, and Robert Weinstein (the "**NY AG Verified Petition**"), alleging that, among other things, from approximately 2005 through at least October 2017, TWC corporate resources were used for unlawful purposes relating to Harvey Weinstein's sexual misconduct.  A copy of the NY AG Verified Petition is attached hereto as **Exhibit 2.**  The New York Attorney General alleges that TWC's management and Board of Directors were "repeatedly presented with credible evidence of [Harvey Weinstein's] sexual harassment of TWC employees and interns, and his use of corporate employees and resources to facilitate sexual activity with third parties, amidst allegations that [Harvey Weinstein] had engaged in unlawful sexual conduct."  NY AG Verified Petition, ¶ 6.

20.     Furthermore, the NY AG Verified Petition alleges that TWC used settlements "that contained strict NDAs to keep law enforcement, the public, and even other TWC employees from discovering the extensive allegations of misconduct against [Harvey Weinstein]." *Id.* ¶ 8.  Indeed, "**TWC itself entered into several of these NDA-containing settlements with company employees**." *Id.* (emphasis added).  TWC "enabled [Harvey Weinstein's] unlawful conduct to continue far beyond the date when, through reasonable diligence, it should have been stopped." *Id.*  The findings of the New York Attorney General are extensive with regard to Harvey Weinstein's misconduct and TWC's knowledge, participation, and acquiescence of the same.

21.     The NY AG Verified Petition describes various employees making formal reports to Human Resources from 2005 through 2017.  The NY AG Verified Petition alleges that the TWC Board of Directors, at a minimum, "had the power to refuse to renew [Harvey Weinstein's] employment contract in 2015, but failed to act, in part out of [Harvey Weinstein's] power and influence on the Board and in part due to concern that [Harvey Weinstein's] departure or a public battle over his contract would inflict financial harm on TWC.  [Harvey Weinstein] and Board members loyal to [Harvey Weinstein] defeated any efforts by independent Board members to investigate claims of sexual misconduct, or to remove [Harvey Weinstein] or prevent him from continuing to sexually harass and harm women." *Id.* ¶ 28.

22.     Furthermore, the NY AG Verified Petition alleges that Harvey Weinstein was "only able to engage in repeated and persistent unlawful conduct because of the failure of key members of TWC's management and Board to ensure that the company complied with relevant nondiscrimination laws and prevent its executives from engaging in unlawful conduct while representing the company." *Id.* ¶ 85 (emphasis added).

23.     At all relevant times herein, David Glasser was the Chief Operating Officer ("**COO**") of TWC. Specifically with regard to his knowledge of the extent and gravity of Harvey Weinstein's misconduct, the NY AG Verified Petition alleges that, "Specifically, by early 2015, certain corporate executives at TWC who had received and handled numerous claims of misconduct from TWC employees, **including the COO [David Glasser, with whom HMPL directly negotiated], became so concerned about [Harvey Weinstein's] misconduct towards women, as well as his expenditure of company resources on improper items, that they decided they needed to notify an independent member of the Board about the misconduct**." *Id.* ¶ 103 (emphasis added).

24.     Critically, the NY AG Verified Petition alleges that, "**Absent these failings of corporate management** and oversight described herein, **[Harvey Weinstein] would not have been able to continue to engage in the repeated and persistent unlawful conduct described here for several years with impunity**." *Id.* ¶ 112 (emphasis added).

25.     In other words, HMPL is informed and believes, and based thereon alleges, that at all relevant times during the negotiations between HMPL and TWC regarding the Picture and entry into the License Agreement in early 2016, the executives with which HMPL directly communicated—including David Glasser—had actual knowledge of the extent and nature of Harvey Weinstein's misconduct, and not only ignored it but also actively covered up such misconduct, and failed to disclose the same to HMPL.

26.     As a result of the foregoing, on February 14, 2018, HMPL wrote TWC a letter (the "**Rescission Letter**") that provided, in relevant part, as follows:

> This letter will put you on notice that HMPL hereby immediately rescinds the Agreement on the grounds that TWC fraudulently induced HMPL to enter into the Agreement and entrust the distribution of the Picture to TWC, by deceiving HMPL and concealing material facts which, if known to HMPL, unquestionably would

have resulted in a decision by HMPL to reject the Agreement and any contractual relationship with TWC.

A true and correct copy of the Rescission Letter is attached hereto marked **Exhibit 3** and incorporated herein by reference as though fully set forth herein.

27.     The only response by TWC at any relevant time herein (including post-petition) to the Rescission Letter was a letter from David Glasser dated February 15, 2018 (the "TWC Response"), in which he writes:

> I am in receipt of your February 14 letter, sent on behalf of Hotel Mumbai Pty Ltd. ("HMPL") and concerning the project *Hotel Mumbai* (the "Picture"). In that letter, you explain that HMPL is rescinding the agreement for the Picture. You ask us to provide a confirmation of the rescission no later than end of business today. Providing a response by the close of the next business day is simply not workable. I need time to consider these issues, including the relative merits of the positions taken in your letter, and discuss them with the company. As I am sure you can imagine, this is not the kind of decision that one in a company of this size can or should make alone and without sufficient forethought. With that being said, I can commit to responding to you shortly, and in any event, no later than Tuesday of next week.

A true and correct copy of the TWC Response is attached as **Exhibit 4**.

28.     The TWC Response stated that TWC would provide a further response no later than February 20, 2018 (or the Tuesday following the date of the TWC Response).  However, as alleged above, and notwithstanding a legal obligation to respond if TWC was contesting the Rescission Notice, at no time prior to (or even after) the commencement of the Debtors' bankruptcy cases did TWC contest the notice of rescission or communicate in any way with HMPL any intent to contest HMPL's rescission of the License Agreement.

29.     On March 20, 2018,  the Debtors filed their *Motion for Entry of Orders (I)(A) Approving Bidding Procedures for Sale of Substantially All of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling Auction for, and Hearing to Approve, Sale of Substantially All of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale,*

10

*Auction and Sale Hearing, (E) Approving Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Bk. D.I. 8] (the "**Sale Motion**").

30.     Despite the prepetition rescission of the License Agreement by HMPL, and the failure of TWC to object or contest the same, the Debtors included the License Agreement as one of the assets to be sold pursuant to the Stalking Horse Agreement (as defined in the Sale Motion), and have designated the Picture as a "Top Title" and a "Top Unreleased Picture" in the Stalking Horse Agreement as set forth in the Sale Motion, Exhibit B, Annex 1 (page 242 of 254).

31.     On April 5, 2018, counsel for HMPL emailed (the "**April 5th Email**") counsel for the Debtors setting forth HMPL's position that the License Agreement was rescinded prepetition, requesting that any ownership dispute be addressed as soon as possible (since the Debtors included the License Agreement in the Sale Motion as an asset of the estate), and requesting evidence of adequate assurance from the stalking horse bidder.  A true and correct copy of the April 5th Email is attached hereto as **Exhibit 5.**  The only response received from the Debtors' counsel was received on April 5, 2018 (the "**TWC April 5th Response**") and stated as follows:  "We will pass the request along to counsel to the Stalking Horse Bidder. My partner Karin DeMasi won't be at the hearing tomorrow but we can find another time in the near future to meet and confer on this matter."  A true and correct copy of the TWC April 5th Response is attached hereto as **Exhibit 6**.

32.     On April 10, 2018, counsel for HMPL emailed a letter dated April 10, 2018 (the "**April 10th Letter**") to counsel for the Debtors pursuant to which HMPL further reiterated that the License Agreement was rescinded and informed the Debtors' counsel that, among other things,

it is critical to address any dispute over ownership immediately. A true and correct copy of the April 10th Letter is attached hereto as **Exhibit 7.**

33.     At no relevant time herein have the Debtors or their counsel responded substantively to the Rescission Notice or any other correspondence requesting that any ownership dispute over the License Agreement be addressed forthwith.  The Debtors acted prepetition and continue to act post-petition as if the License Agreement does not exist.  The Debtors stopped performing under the License Agreement in October of 2017 and have not done a single act in furtherance of the marketing and distribution of the Picture that would typically take place during this time period (i.e., from October of 2017 until now).

34.     The only evidence or indication that the Debtors assert any interest in the License Agreement is the fact that "Hotel Mumbai" is listed as an asset on an exhibit to the Sale Motion and it is listed on the Debtors' *Notice of Potential Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Amounts* [Bk. D.I. 216] (the "**Proposed Assignment List**"), in which the Debtors lists HMPL as a "counterparty to a contract or lease that may be assumed and assigned as part of the sale."  *See* Proposed Assignment List [Bk. D.I. 216], Exhibit 1, item nos. 3567, 3568, and 3569 (referring to the License Agreement).  Other than merely listing "Hotel Mumbai" as an asset and the License Agreement as an agreement to be assumed and assigned, neither the Debtors nor their counsel have communicated in any way to HMPL or its counsel that the License Agreement is property of the estate, and the Debtors have failed to perform required duties under the License Agreement since October 2017.

35.     Since the date that the Rescission Letter was sent (on February 14, 2018), TWC has not done a single act under the License Agreement to perform under the License Agreement or

otherwise indicate that it is a party to a License Agreement with HMPL.  TWC has failed to refute the Rescission Notice prepetition or post-petition.

36.     The License Agreement is not "property of the estate" as it was terminated pre-petition, and the filing of a bankruptcy petition does not revive an already-terminated contract. *See, e.g., In re Best Film & Video Corp.*, 46 B.R. 861, 870 (Bankr. E.D. N.Y. 1985) (finding a distribution agreement terminated prepetition on account of numerous breaches of the agreement by the licensee, and explaining that filing a chapter 11 petition will neither "resuscitate a contract that has already been terminated" nor will it "extend a contract beyond its original terms," as the filing of bankruptcy does not enlarge the rights of a debtor under such contract).

37.     Because the License Agreement was rescinded prepetition, the Debtors no longer have any rights to the Picture under the License Agreement, and consequently cannot assume or assign the License Agreement.  The Picture and License Agreement are not assets of this bankruptcy estate that can be sold, assumed, or assigned.

38.     Because the Debtors have erroneously included the License Agreement as an asset of the estate, HMPL is unable to enter into a distribution agreement with a new distributor given the Debtors' alleged interest represents a cloud on the title to the Picture.

39.     The distribution of the Picture domestically is critical to the success of the Picture as the foreign distribution rights to the Picture have been licensed to foreign distributors, who are intending to release the Picture on or before the 10-year "anniversary date" of the Hotel Mumbai attacks which is November 2018.

40.     It is well established that if foreign distribution and release of a motion picture film occurs before a domestic release, the value of the motion picture film, among other things, will be significantly and negatively impacted due to, among other things, the potential exposure of the

motion picture film being "pirated."  *See, e.g., In re Relativity Fashion, LLC*, 696 Fed.Appx. 26,

29  (2nd Cir. 2017)(noting that testimony "before the bankruptcy court established that Netflix's

proposed pre-release streaming of films [before the domestic theatrical release of the films] would

effectively destroy the revenue streams anticipated by the Plan").

41.     Furthermore, in order to capitalize on the Picture and domestic and international

award ceremonies, it is imperative that the domestic distribution of the Picture occurs prior to its

international release.  Every day that the Debtors continue to represent to the entertainment

industry that the License Agreement is an asset of the estate causes irreparable harm to HMPL's

ability to secure a new distributor which can ensure a US theatrical release of the Picture prior to

the international release.

## IRREPARABLE HARM

42.     The License Agreement was rescinded pre-petition.  The Debtors have failed to

perform a single act under the License Agreement since October of 2017.  The Debtors' inclusion

of the License Agreement in the Sale Motion has caused a significant disruption in HMPL's ability

to market and distribute the Picture in the Territory, and could result in the destruction of the

revenue stream from the Picture.

43.     The Debtors' inclusion of the License Agreement in the Sale Motion has further

damaged HMPL's actors, directors and producers and their reputations by prohibiting the Picture

from being screened and marketed in the manner that is customary in the industry to ensure

exposure to the domestic and international film festivals and award ceremonies.

44.     Moreover, due to the Debtors' misconduct, every day that passes increases the

chance that the Picture is released internationally (prior to the November 2018 10 year anniversary

of the 2008 Mumbai attacks), which will cause irreparable harm to HMPL, its actors, directors and

producers.

45.     The harm to HMPL and its actors, directors and producers from the Debtors'
conduct described herein outweighs any harm to the Debtors from granting the requested relief.

46.     Money damages are not sufficient because absent the required injunctive and
declaratory relief requested herein, HMPL's prospects for awards and a successful launch of the
Picture will be diminished to the detriment of HMPL's lenders, investors, actors, directors, and
producers, and the accompanying harm to their respective reputations and goodwill.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(For Declaratory Relief that the License Agreement is Not Property of the Estate ~ 11
U.S.C. §§ 105(a), 363(b)(1) and 541))**

47.     HMPL incorporates herein by reference as though set forth in full paragraphs 1
through 46 above.

48.     HMPL requests a declaratory judgment under Sections 105(a), 363 and 541 of the
Bankruptcy Code, Bankruptcy Rules 7001(1), 7001(7) and 7001(9), 28 U.S.C. § 2201, and
applicable provisions of non-bankruptcy law, that the License Agreement is not property of the
estate.

49.     Pursuant to Section 541 of the Bankruptcy Code, property of a debtor's estate
includes all legal or equitable interest of the debtor in property.

50.     The License Agreement is not property of the estate because it was terminated pre-
petition.

51.     An actual controversy exists between the HMPL and TWC as to their respective
legal rights and obligations regarding the License Agreement as set forth above.

52.    Plaintiff HMPL maintains that the Rescission Letter was valid and enforceable and without contest by TWC and based thereon, the Debtors have no right, title or interest in the License Agreement under section 541 of the Bankruptcy Code, including but not limited to, having no right to license, distribute or market the Picture in any manner whatsoever, or any authority (or the ability) to assume and assign the License Agreement to any third party under sections 363 and 365 of the Bankruptcy Code.

53.    Upon information and belief, HMPL believes that the Debtors dispute HMPL's contentions set forth above and that the Debtors assert that the License Agreement is property of the TWC bankruptcy estate and that the Debtors have the right to assume and assign the License Agreement to third parties.

54.    As a result of the dispute between the parties as heretofore set forth, an actual and judicable controversy exists between HMPL and the Debtors and accordingly, a judicial determination is necessary and appropriate at this time in order that the respective rights and obligations of HMPL and the Debtors in and to the License Agreement may be ascertained.

**SECOND CLAIM FOR RELIEF**

**(For Declaratory Relief that the License Agreement Was Rescinded on Grounds of Frustration of Purpose)**

55.    HMPL incorporates herein by reference as though set forth in full paragraphs 1 through 54 above.

56.    As noted above, an actual controversy exists between HMPL and TWC as to their respective legal rights and obligations regarding the License Agreement and the Picture. Plaintiff HMPL maintains that the Rescission Letter was valid and enforceable and without contest by TWC. HMPL is informed and believes that the Debtors dispute that contention, and believe the

License Agreement and the Picture are estate assets that can be sold, assumed, and/or assigned to a third party under the Bankruptcy Code.

57.     HMPL entered into the License Agreement with TWC primarily based upon TWC and Harvey Weinstein's reputation for marketing and distributing successful independent films and garnering awards during awards season.

58.     A basic assumption of HMPL in entering into the License Agreement was that TWC and Harvey Weinstein still had the reputation and ability to market independent films to Academy voters, among other things, and to distribute independent films in the same manner and success as they had previously done.

59.     Accordingly, the fundamental purpose of the License Agreement for which HMPL bargained has been frustrated because TWC is no longer able to perform its duties under the License Agreement.  Indeed, TWC is seeking to assume and assign its purported rights under the License Agreement in connection with the Sale Motion and scheduled Sale Hearing because its reputation has been made radioactive as a result of the allegations surrounding Harvey Weinstein and the TWC Cover-Up, and can no longer successfully market and distribute films as it once could.

60.     HMPL is thus entitled to a judgment declaring that the License Agreement was validly rescinded because the basic purpose of the contract—to use the reputation and prior success of TWC to market and distribute the Picture—has been frustrated.

## THIRD CLAIM FOR RELIEF

### (For a Judgment that the License Agreement is Void ~ Fraud in the Inducement)

61.     HMPL incorporates herein by reference as though set forth in full paragraphs 1 through 60 above.

62.    In the event the Debtors dispute that the License Agreement was validly rescinded prepetition, and as an alternative to the First and Second Claims for Relief alleged *supra*, HMPL seeks a judgment rescinding the License Agreement on the grounds of fraud in the inducement.

63.    HMPL is informed and believes, and based thereon alleges, that in or around April-May, 2016 and during the negotiations between HMPL and TWC that preceded execution of and entry into the License Agreement, TWC and its representatives had superior knowledge of essential facts that directly impacted the reputation of the TWC brand, *i.e.*, that the company had participated in covering up the extensive sexual scandals and misconduct of Harvey Weinstein.

64.    TWC failed to disclose these facts to HMPL at any time, despite having knowledge that HMPL sought a license agreement with TWC specifically because of TWC's (and Harvey Weinstein's) previously stellar reputation for helping independent films, such as the Picture, to gain international success and be seriously considered during awards season.

65.    TWC had a duty to disclose these facts to HMPL during negotiations, and these facts were not reasonably discoverable to HMPL through the exercise of ordinary intelligence.

66.    The facts regarding Harvey Weinstein's sexual misconduct were material to the negotiations between HMPL and TWC because, among other things, they relate to the reputation and credibility of TWC and Harvey Weinstein, and HMPL's primary reason for entering into the License Agreement in the first place was because of the supposed stellar reputation of TWC for obtaining critical acclaim for independent films such as the Picture.

67.    Had HMPL known, at any time, before or during the negotiations for the License Agreement of the TWC Cover-Up and the extent of Harvey Weinstein's alleged crimes and misconduct, it never would have entered into the License Agreement or allowed the Picture to be distributed by TWC or to be associated in any way with the now discredited TWC brand.

68.     Prior to filing this Complaint, HMPL did not receive any money or other consideration from TWC that can be returned to TWC.

69.     Since the October 2017 disclosure of Harvey Weinstein's sexual scandals and misconduct, TWC has failed to perform under the terms of the License Agreement.

70.     Due to TWC's nondisclosure of material facts, HMPL is unable to, among other things, engage with other comparable film distribution companies to ensure the Picture is released timely and that Picture and its actors, directors, and writers, etc. are considered during awards season.

71.     Money damages are not sufficient because the reputations and goodwill of HMPL's actors, directors, writers, etc. will be directly affected by the manner in which this film is marketed and distributed.

72.     Accordingly, HMPL requests a judgment rescinding the License Agreement.

## FOURTH CLAIM FOR RELIEF

### (For Permanent Injunction – Fed.R.Bankr.Proc. 7065; 11 U.S.C. § 105(a))

73.     HMPL incorporates herein by reference as though set forth in full paragraphs 1 through 72 above.

74.     Because the Debtors have erroneously included the License Agreement as an asset of the estate, HMPL is unable to enter into a distribution agreement with a new distributor.

75.     The distribution of the Picture domestically is critical to the success of the Picture as the foreign distribution rights to the Picture have been licensed to foreign distributors, who are intending to release the Picture on or before the 10-year "anniversary date" of the Hotel Mumbai attacks which is November 2018.

76.     If the foreign distribution and release of a motion picture film occurs before a domestic release, the value of the motion picture film will be significantly and negatively impacted due to the potential exposure of the motion picture film being "pirated".  *See, supra, In re Relativity Fashion, LLC,* 696 Fed.Appx. 26, 29 (2nd Cir. 2017) (noting that testimony "before the bankruptcy court established that Netflix's proposed pre-release streaming of films [before the domestic theatrical release] would effectively destroy the revenue streams anticipated by the Plan").

77.     In order to capitalize on the Picture and domestic and international award ceremonies, it is imperative that the domestic distribution and release of the Picture occurs prior to any foreign release.  Every day that the Debtors continue to represent to the entertainment industry that the License Agreement is an asset of the estate causes irreparable harm to HMPL's ability to secure a new distributor which can ensure a US theatrical release of the Picture prior to the international release.

78.     The License Agreement was rescinded pre-petition.  The Debtors' inclusion of the License Agreement in the Sale Motion has caused a significant disruption in HMPL's ability to distribute the Picture in the Territory, and could result in the destruction of the revenue stream from the Picture.

79.     The Debtors' inclusion of the License Agreement in the Sale Motion has further damaged HMPL's actors, directors and producers and their reputations by prohibiting the Picture from being screened and marketed in the manner that is customary in the industry to ensure exposure to the domestic and international award ceremonies.

80.     Moreover, due to the Debtors' misconduct, every day that passes increases the chance that the Picture is released internationally (prior to the November 2018 10 year anniversary of the 2008 Mumbai attacks), which will cause irreparable harm to HMPL, its actors, directors and

producers.

81.     The harm to HMPL and its actors, directors and producers from Defendant's conduct described herein outweighs any harm to Defendant from granting the requested relief.

82.     Money damages are not sufficient because absent the required injunctive and declaratory relief requested herein, HMPL's prospects for awards and a successful launch of the Picture will be diminished to the detriment of HMPL's lenders, investors, actors, directors, and producers, and the accompanying harm to their respective reputations and goodwill.

83.     HMPL requests a permanent injunction requiring and directing TWC, and all representatives, employees or agents of TWC (i) to remove the License Agreement / Picture from its list of assets in the Sale Motion, (ii) to cease interfering with HMPL's ability to enter into an agreement with a third party to distribute the Picture in the Territory, and (iii) to cease any other conduct that intentionally harms or interferes with the distribution and release of the Picture in the Territory and/or with the reputation of HMPL's actors, directors or producers.

## PRAYER FOR RELIEF

Based on the foregoing, HMPL respectfully requests that the Court enter judgment in favor of HMPL and against the Debtors as follows:

## FIRST CLAIM FOR RELIEF

1.     For a judgment declaring that the License Agreement and the Picture are not assets of the bankruptcy estate under section 541 of the Bankruptcy Code, and that the same cannot be assumed or assigned as part of the Sale Agreement, and that HMPL has title to the Picture free and clear of any and all interests of TWC;

## SECOND CLAIM FOR RELIEF

2.     For a judgment declaring that the License Agreement was validly rescinded on grounds of frustration of purpose.

## THIRD CLAIM FOR RELIEF

3.     For a judgment rescinding the License Agreement.

## FOURTH CLAIM FOR RELIEF

4.     For a preliminary and permanent injunction, restraining and enjoining TWC from transferring, assuming or assigning the License Agreement and the Picture during the pendency of this action.

## ALL CLAIMS FOR RELIEF

5.     For attorney fees and costs;

6.     For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated:  April 16, 2018
Wilmington, Delaware

GELLERT SCALI BUSENKELL & BROWN LLC

By: */s/ Michael Busenkell*_____
Michael Busenkell (No. 3933)
1201 N. Orange Street, Suite 300
Wilmington, DE 19801
(302) 425-5812
(302) 425-5814 (fax)

-and-

Larry W. Gabriel (admitted *pro hac vice*)
Susan K. Seflin (admitted *pro hac vice*)
Jessica L. Bagdanov (admitted *pro hac vice*)
BRUTZKUS GUBNER
21650 Oxnard Street
Woodland Hills, CA 91367
(818) 827-9000
(818) 827-9099 (fax)

*Counsel to Hotel Mumbai Pty Ltd., Plaintiff*